IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

BILLY D. WESSON                                            PLAINTIFF

V.                        NO. 09-5083

MICHAEL J. ASTRUE,
Commissioner of Social Security                            DEFENDANT

**MEMORANDUM OPINION**

Plaintiff, Billy D. Wesson, brings this action pursuant to 42 U.S.C. §405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner), denying his claims for a period of disability and disability insurance benefits under Title II of the Social Security Act (the Act) and Supplemental Security Income under Title XVI of the Act. In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. See 42 U.S.C. §405(g).

**Procedural Background**

Plaintiff applied for disability insurance benefits and supplemental security income on March 6, 2007, alleging disability since September 13, 2002.[1] (Tr. 131-133, 134-136). Plaintiff's applications were denied initially and on reconsideration. (Tr. 71, 72, 90-92, 93-95, 22-23, 73, 74, 97-98, 99-100). Pursuant to Plaintiff's request, a hearing before an Administrative Law Judge (ALJ) was held on September 11, 2008, at which Plaintiff, Plaintiff's mother, and a

---

[1] Plaintiff had twice previously applied for disability, and said applications were denied. No appeals were taken. (Plaintiff's Appeal Brief p. 1).

vocational expert (VE) testified. (Tr. 33-70). On November 26, 2008, the ALJ issued an unfavorable decision. (Tr. 75-89). The Appeals Council denied Plaintiff's request for review on February 12, 2009, and the decision of the ALJ therefore became the final decision of the Commissioner. (Tr. 1-4).

In his decision, the ALJ found that Plaintiff met the insured status requirements of the Act through June 30, 2007, had not engaged in substantial gainful activity since September 13, 2002, and that Plaintiff suffered from the following severe impairments: mood disorder (depression) and substance addiction disorder. (Tr. 80). The ALJ further found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments, and that Plaintiff had the Residual Functional Capacity (RFC) to perform work at all exertional levels with certain limitations. (Tr. 80, 83). The ALJ found that Plaintiff could not perform his past relevant work, but that there were jobs in the national economy that he would be able to perform, such as bench assembler, maid/housekeeper, and hand packager. (Tr. 87-88). Accordingly, the ALJ determined that Plaintiff was not disabled.

**Evidence Presented**

Plaintiff was born in 1978 and completed the tenth grade. (Tr. 40). He tried to obtain a GED, but was unable to do so because he stated that he could not retain information very long and forgot what he had read. (Tr. 40). Plaintiff had three children by his previous fiancé, but was unable to work and pay his child support. (Tr. 39). On September 13, 2002, when his previous fiancé was not letting him see his children, Plaintiff attempted suicide by shooting himself in the neck. (Tr. 43). Plaintiff alleged that the injury limited his ability to work because he did not have a good memory, had migraines, depression, dementia, and back and leg pain.

(Tr. 148).

After being treated for the gunshot wound at St. Mary's Hospital, Plaintiff was referred to Ozark Guidance Center (OGC). (Tr. 296). Plaintiff was then committed to the Arkansas State Hospital for a psychiatric evaluation, which was conducted on October 4, 2002. (Tr. 302). At the state hospital, Plaintiff denied any past or current tobacco use and reported drinking beer and whiskey on occasion only. However, Plaintiff's mother stated that he drank approximately twelve beers per day. (Tr. 304). Plaintiff was diagnosed then with:

> Axis I - Major depressive disorder, alcohol abuse;
> Axis II - Deferred;
> Axis III: Status post gunshot wound to the head and neck;
> Axis IV - Primary support, relationships, financial, housing, and legal; and
> Axis V - GAF-40.

(Tr. 306). He was also noted to have a left ear hearing deficit, and the prognosis was guarded-fair. (Tr. 308-311). Plaintiff was discharged from the state hospital on November 4, 2002, and Dr. Veronica Williams, Staff Psychiatrist and Attending Physician, stated that his condition was improved, as he was no longer voicing suicidal ideation, had a plan for the future, and was willing to voluntarily seek inpatient substance abuse treatment for his alcoholism. (Tr. 300). Plaintiff's prognosis was guarded, given the severity of his attempt and history of substance abuse, although a positive factor was his willingness to seek treatment and his good initial response to antidepressant medication. (Tr. 301).

On December 4, 2002, Dr. Minh-Tam Dang, a neurologist at Mercy Health System of Northwest Arkansas, Rogers Diagnostic Clinic, examined Plaintiff and stated that the MRI showed enlargement of the ventricular system. Dr. Dang's impression was as follows:

1. Gunshot wound.

AO72A
(Rev. 8/82)

2. Brain encephalomalacia at the right frontal related to the brain contusion before.
3. Hydrocephalus secondary to the above.
4. Headache secondary to the above.
5. Anemia could be secondary to surgery and loss of blood.

(Tr. 277). Dr. Dang believed that the CT scan should be repeated in February and if the ventricle system was enlarged then, Plaintiff would need to have a shunt and be referred to a neurosurgeon. On January 7, 2003, Dr. Dang wrote a letter referring Plaintiff to Richard S. Kyle, M.D., a neurosurgeon, to review Plaintiff's case relating to the gunshot wound and the enlargement of the ventricular system, which worried Dr. Dang. (Tr. 278). There are no records in the transcript indicating that Plaintiff was ever seen by Dr. Kyle.

Subsequent to his self inflicted gunshot wound in September of 2002, Plaintiff was admitted to hospitals in 2003, 2006 and 2007, as a result of drug overdoses. (Tr. 375, 341, 319). Plaintiff contended that all occasions were as a result of accidental overdoses rather than intentional, because he was trying to get rid of his headaches. The discharge diagnosis from the first overdose was narcotic overdose. (Tr. 375). According to the hospital record, Plaintiff took a Duragesic patch and chewed it and sucked out the content. (Tr. 375). He was found comatose on the apartment floor. The record also reflected that he continued to drink about ten beers per day. In addition, the record reflected that during that hospital stay, Plaintiff was quite difficult, refused treatment and left without anyone knowing it and was not able to be found. (Tr. 375).

On February 21, 2005, a General Physical Examination was done by consultative examiner Dr. Neil Mullins, who found the Plaintiff taking no medications, but reporting chronic headaches, vertigo, deafness in his left ear, depression and a history of tremors. (Tr. 219). Dr. Mullins assessed no limitations in Plaintiff's ability to walk, stand, sit, lift, carry, handle, finger,

AO72A
(Rev. 8/82)

see, hear, or speak. (Tr. 219-224).

A second overdose occurred in May of 2006, when his mother found him unresponsive and unable to be aroused, and called 9-1-1. The hospital diagnosis was: suicide attempt with opiate overdose, possible tricyclic overdose, and otherwise unknown. Plaintiff also had acute renal failure of unclear etiology. (Tr. 342). Apparently, Plaintiff's urine drug screen did turn up positive for opiates, and his girlfriend was unaware of how he obtained that medication. It was noted, however, that Plaintiff lived with a family member that did have some oxycodone available. (Tr. 341). In the hospital discharge summary report, Dr. R.W. Donnell diagnosed Plaintiff with mixed drug overdose, accidental, and a history of bipolar disorder. Plaintiff's acute renal failure was resolved. (Tr. 339). Dr. Randall W. Black, an ENT specialist, also saw Plaintiff in consultation regarding his hearing loss, and said that he had some left ear hearing loss that was related to the old self-inflicted gunshot wound, and the apparent worsening of his hearing loss might have been related to the medication overdose. (Tr. 339).

On December 10, 2006, Plaintiff was escorted by his aunt to St. Mary's Hospital, who stated that he had been talking about killing himself that day, either by shooting himself or by hanging himself. (Tr. 329). He was supposed to be on Cymbalta, but ran out of it two months before and did not try to get any more because he said he could not afford it. (Tr. 329). He had alcohol on his breath and had at least three or four beers to drink before going to the emergency room. (Tr. 329).

On January 29, 2007, Plaintiff was again presented to St. Mary's Hospital, after taking a mixed drug overdose. (Tr. 319). Plaintiff denied he was attempting to harm himself and said that he took too many medicines because of a headache. (Tr. 319). He was diagnosed with

suicide ideation; chronic opioid dependance and abuse; chronic pain syndrome; drug overdose unintentional, secondary to methadone and valium. (Tr. 317).

On February 4, 2007, Plaintiff presented himself to Dr. Brent Bolyard, from Solutions: Psychiatry, Neurometrics, Psychotherapy, for a diagnostic evaluation and assessment of the use of medication in treatment planning after being admitted to Vista Health Hospital under the care of Dr. Lewis E. Britton. (Tr. 250). Dr. Bolyard gave the following diagnosis:

| | |
|---|---|
| AXIS I: | Major depression – recurrent, severe without psychotic features |
| | Dementia status post gunshot wound to the head |
| AXIS II: | Diagnoses deferred |
| AXIS III: | No diagnosis |
| AXIS IV: | Problems of primary support group, loss of contact with children, disabled |
| AXIS V: | GAF equal 30 |

(Tr. 252).

In his discharge summary from Vista Health, Dr. Britton noted that although Plaintiff said he forgot how many pills he had taken, his mother claimed that the event was a suicide attempt. (Tr. 235). Dr. Britton's final diagnosis was:

| | |
|---|---|
| AXIS I: | Major depressive disorder, recurrent, severe, without psychotic features. |
| | Dementia due to head trauma. |
| | Alcohol dependence in early remission. |
| | Pain disorder associated with psychological factors, chronic. |
| AXIS II: | No diagnosis. |
| AXIS III: | Status post overdose. |
| | Lumbar muscle spasms. |
| | Chronic headache and neck pain. |
| | Deaf, left ear. |
| | Status post self-inflicted gunshot wound to the neck and head 2002. |
| AXIS IV: | Economic problems; problems with access to health care services; legal problems. |

AO72A
(Rev. 8/82)

> AXIS V: GAF 05 highest level in past year[2]
> GAF 21 on admission
> GAF 34 on discharge.

(Tr. 238).

A Mental RFC Assessment was completed by medical consultant, Dr. Joseph Kahler, on April 26, 2007. (Tr. 272-274). Dr. Kahler found Plaintiff to have major depressive disorder, complicated by a history of significant polysubstance dependence. (Tr. 274). Dr. Kahler found that with projected abstinence, Plaintiff's depression and cognitive limitations would be expected to remit although he may have residual symptoms that moderately limited his ability to remember and execute complex instructions. (Tr. 274). He found that Plaintiff appeared to retain the capacity for simple, low stress work, with few social demands.

Another Mental RFC Assessment & Physical was completed on August 26, 2008, by Dr. James Baker, an internist. (Tr. 12-15, 470-471). Dr. Baker found Plaintiff to have a poor ability or markedly limited ability in 17 out of 21 categories on the mental assessment form. (Tr. 12-13). Dr. Baker indicated that he was not qualified as an internist to complete the physical assessment. (Tr. 15).

On April 30, 2007, Plaintiff saw his treating physician, Dr. Kim Emerson. (Tr. 453). Dr. Emerson noted that Plaintiff felt he was making progress and that all of his medications seemed to be working well for him. (Tr. 453). He was happy with the Cymbalta and felt it had changed him in many ways. He further stated that his pain was doing "ok" and that for the most part the methadone kept it in control and that the pain was improving some. Dr. Emerson further noted

---

[2] The Court is unsure if GAF 05 is a typographical error, since it is so low. If not, a GAF of 05 is defined as someone with: "Persistent danger of severely hurting self or others (e.g., recurrent violence) OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death. Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000).

that Plaintiff's mother was still distributing his medications to him and that she was taking care of Plaintiff. Plaintiff reported that his pain was the worst all over his back and in his head. (Tr. 453). Plaintiff was also having pain in his calf muscles and the methadone helped somewhat, but not much. (Tr. 453).

**Discussion**

In his decision, the ALJ found that Plaintiff's headaches had no more than a minimal effect on his ability to do basic work activities and were therefore not severe, consistent with SSR 85-28. However, the record is replete with Plaintiff's visits to various health care providers, mostly hospitals, complaining of severe headaches, from between late 2002 to 2007. (Tr. 407, 410-412, 403, 283, 277, 281, 225, 392, 387, 384, 380, 276, 224, 230, 359, 373, 362, 360, 357, 338, 335, 336, 445, 330, 327, 319, 238, 455, 289, 314). The ALJ also found that Plaintiff's headaches were effectively controlled by medications. (Tr. 81). However, the record does not support this conclusion. At the hearing before the ALJ on September 11, 2008, Plaintiff testified that he had headaches daily-at least once a day-and when he had them, he had to lie in a dark room and take his medications. (Tr. 48). Plaintiff further testified that with a regular headache, he could take medication and lie down and it would become tolerable. (Tr. 49). However, when he had a really severe headache, he had to go to the emergency room to receive a shot. He stated that even taking the medicine did not totally relieve the headache, but rather just made it tolerable. (Tr. 49). In addition, since Plaintiff had a history of overdosing on his prescribed medications, Plaintiff was no longer given access to his medications-his mother kept them at her house and brought them to him every day, and Dr. Emerson stated it would stay that way for a long time. (Tr. 50, 454).

-8-

The Court recognizes that it is the Plaintiff's burden to establish that his impairment or combination of impairments are severe. Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007). However, this standard has been held to be a "de minimis standard." Hudson v. Bowen, 870 F.2d 1392, 1395 (8th Cir. 1989). The Court believes that based upon the record as a whole, Plaintiff's headaches constituted a severe impairment consistent with the Social Security Regulations.

The ALJ also noted that on February 21, 2005, a General Physical Examination was done by consultative examiner Dr. Neil Mullins, who found the Plaintiff taking no medications, but reporting chronic headaches, vertigo, deafness in his left ear, depression and a history of tremors. (Tr. 219). Dr. Mullins assessed no limitations in Plaintiff's ability to walk, stand, sit, lift, carry, handle, finger, see, hear, or speak. (Tr. 219-224). However, after this date, Plaintiff had additional overdose incidents and complaints of severe headaches and also was taking numerous medications. The Court believes a more recent Physical RFC assessment should be obtained from an examining physician.

The ALJ also found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged depression, headaches, and memory difficulty, but that Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent they were inconsistent with the ALJ's RFC assessment. (Tr. 84). It is interesting to note that the ALJ found the testimony of Plaintiff's mother, Sandy Wesson, to be generally credible. The mother testified that Plaintiff had problems remembering how to take his medicine, and that someone had to be around him all the time because he had to take his medicine at certain times during the day. (Tr. 86, 63). She further stated that Plaintiff could not

-9-

AO72A
(Rev. 8/82)

help himself and was like a child. She said that "we do just about everything for him." (Tr. 64). She stated that he had to be helped to get to places, that he got lost when he drove, and that he was not able to be around cooking because they did not trust him. (Tr. 64).[3]

In the present case, Mental RFC Assessments were only obtained by a non-examining physician, Dr. Joseph Kahler, and Dr. James Baker, an internist who found that Plaintiff had either poor ability or was markedly limited in seventeen areas on the mental assessment form.[4] Additionally, despite a referral in 2003 by Dr. Minh-Tam Dang, a neurologist, to a neurosurgeon, there is no record indicating Plaintiff was ever seen by a neurosurgeon, or an explanation as to why he was not seen by one. The Court finds it appropriate to remand this matter for the ALJ to submit interrogatories to Dr. Minh-Tam Dang, asking Dr. Dang to address the question of whether he believes it is still necessary for Plaintiff to be seen by a neurosurgeon, and if so, to make the appropriate arrangements for Plaintiff to see a neurosurgeon. The ALJ should also obtain a Mental RFC Assessment from an examining physician.

In his findings, the ALJ noted that after his suicide attempt in 2002, Plaintiff was able to return to his past work as a house painter. However, the ALJ also noted that his employment was terminated as the result of his absenteeism. (Tr. 86). The ALJ concluded that otherwise, Plaintiff had demonstrated the ability to work, therefore discrediting Plaintiff's allegation that he was not able to work. What the ALJ failed to address was the fact that according to Plaintiff, his absenteeism was a result of his injuries - "I was too sore and my head was hurting." (Tr. 42).

---

[3] According to Plaintiff's testimony, he had a driver's license, but it was under suspension. (Tr. 65). The Court notes that throughout the ALJ's decision, the ALJ continued to state that Plaintiff could drive, but failed to note the suspended license or the fact that Plaintiff got lost when he did drive.

[4] The court finds it curious that Dr. Baker, an internist, would feel free to evaluate Plaintiff's mental abilities and not feel free to assess Plaintiff's physical abilities.

AO72A
(Rev. 8/82)

As stated above, at the onset of Plaintiff's headaches, depending upon their severity, he had to either stay in a dark room or go to the emergency room to obtain a shot.

**Conclusion**

Based upon the foregoing, the Court finds it necessary to remand this matter to the ALJ with instructions to: 1) consider the impact of headaches as a severe impairment; 2) submit interrogatories to Dr. Minh-Tam Dang, asking Dr. Dang to address the question of whether he believes it is still necessary for Plaintiff to be seen by a neurosurgeon, and if so, to make the appropriate arrangements for Plaintiff to see a neurosurgeon and submit interrogatories to the neurosurgeon; and 3) obtain not only a Mental RFC Assessment from an examining physician, but also a Physical RFC Assessment from an examining physician, who can also address the Plaintiff's physical functional limitations. The ALJ should thereafter reconsider the Plaintiff's RFC in light of the new Physical and Mental RFC Assessments obtained.

Based upon the foregoing, the undersigned reverses the decision of the ALJ and remands this case to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. §405(g).

IT IS SO ORDERED this 25th day of March, 2010.

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)